# In the United States District Court
## for the Southern District of Georgia
## Waycross Division

| | | |
|---|---|---|
| FIDELITY AND DEPOSIT COMPANY OF MARYLAND and ZURICH AMERICAN INSURANCE COMPANY, | : | CIVIL ACTION |
| | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| DOUGLAS ASPHALT COMPANY, JOEL SPIVEY, and RONNIE SPIVEY, | : | |
| | : | NO. CV507-42 |
| Defendants. | : | |

## BENCH TRIAL RULING

The present case arises out of a dispute between Plaintiffs, Fidelity and Deposit Company of Maryland and Zurich American Insurance Company (collectively, "Sureties"), and Defendants, Douglas Asphalt Company, Joel Spivey, and Ronnie Spivey, over indemnity obligations relating to a construction project in Lowndes County, Georgia. Plaintiffs allege that Defendants breached the terms of an indemnity agreement by failing to reimburse Plaintiffs for payments made on payment bond and performance bond claims. Defendants argue that Sureties performed their underlying bond obligations in bad faith, thereby relieving

Defendants of their obligations under the indemnity agreement.  Plaintiffs filed a motion for summary judgment which the Court granted as to Plaintiffs' payment bond claims, and denied as to Plaintiffs' performance bond claims.  (<u>See</u> Dkt. No. 58.)

On August 20 and 21, 2008, the Court conducted a bench trial on the Plaintiffs' claims seeking reimbursement for payments made under the performance bond.  Before trial, the parties submitted joint stipulations of fact that are incorporated into this Order.  (Dkt. No. 44, Attach. A, Stipulations ("Stip.").)  At the close of the evidence, the Court gave the parties thirty days to supplement their proposed findings of fact and conclusions of law.  Based on the testimony of the witnesses, the exhibits and depositions admitted into evidence, and the parties' stipulations, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## I.  **FINDINGS OF FACT**

The Court hereby makes the following findings of fact:

## A.  **Indemnity Agreement**

1.  In 2002,  Douglas Asphalt Company ("Douglas Asphalt")

entered into a contract with the Georgia Department of Transportation ("GDOT") to perform certain widening, reconstruction, and resurfacing work on an approximately 14 mile section of Interstate 75 located in Lowndes County, Georgia (the "Lowndes Project"). (See Stip. 3.)

2.   GDOT required Douglas Asphalt to obtain performance and payment bonds on the Lowndes Project.  Sureties executed Bond No. 8153101 in the penal sum of $67,023,494.  The bond agreements identified Douglas Asphalt as the principal and GDOT as the obligee.  (See id.)

3.   In consideration for executing the bonds, Douglas Asphalt, Joel Spivey, and Ronnie Spivey (collectively, "Indemnitors"), signed an indemnity agreement (the "Agreement"), agreeing to indemnify Sureties for any disbursements made on the payment and performance bonds. (Stips. 1 & 2.)

4.   In the Agreement, Indemnitors agreed that:

> [i]n the event of any breach or default asserted by the obligee in any said Bonds, or the Contractor . . . has failed to pay obligations incurred in connection therewith, . . . the Surety shall have the right, at its option and in its sole discretion . . . to take possession of any part or all of the work under any contract . . . covered by any said Bonds, and at the expense of the Contractor and Indemnitors to complete or arrange for the completion of the same, and the

> Contractor and Indemnitors shall promptly
> upon demand pay to the Surety all losses,
> and expenses so incurred.

(Pls.' Ex. 1, Agreement ¶ 6, "Takeover".)

5.   Indemnitors agreed that "the Surety shall be entitled to charge for any and all disbursements made by it in good faith . . . under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed[.]" (Agreement ¶ 2, "Indemnity".)

6.   Indemnitors further agreed "that the vouchers or other evidence of any such payments made by the Surety shall be *prima facie* evidence of the fact and amount of the liability to the Surety."   (Id.)

7.   Additionally, Indemnitors agreed that:

> Surety shall have the right to adjust,
> settle or compromise any claim, demand,
> suit or judgment upon the Bonds, unless
> the Contractor and the Indemnitors shall
> request the Surety to litigate such claim
> or demand, or to defend such suit, or to
> appeal from such judgment, and shall
> deposit with the Surety, at the time of
> such request, cash or collateral
> satisfactory to the Surety in kind and
> amount, to be used in paying any judgment
> or judgements rendered or that may be
> rendered, with interest, costs, expenses
> and attorneys' fees, including those of
> the Surety.

4

(Agreement ¶ 13, "Settlement".)


**B.  Breach of Indemnity Agreement**

1.  GDOT, in correspondence dated as early as May 2006, alleged that Douglas Asphalt was not actively working on the Lowndes Project.  In June 2006, Douglas Asphalt gave GDOT a new work schedule with a project completion date in mid-October 2006.

2.  By December 2006, there were six outstanding payment bond claims in excess of $900,000 on the Lowndes Project, and the project was not completed.

3.  By letter dated January 4, 2007, GDOT declared Douglas Asphalt in default on the Lowndes Project for failing to pay subcontractors and suppliers on the project and failing to complete work on the project.  (Stip. 4.)

4.  Tom Logue, Douglas Asphalt's Construction Manager and corporate representative, and Joel Spivey, Douglas Asphalt's President, conceded that Douglas Asphalt had not paid certain subcontractors and suppliers.  Mr. Logue and Joel Spivey maintained that Douglas Asphalt was unable to pay the subcontractors and suppliers because GDOT withheld funds owed to Douglas Asphalt on the Lowndes Project.

5.  Sureties investigated GDOT's claims and made numerous requests that Douglas Asphalt provide Sureties with any

defenses to the payment bond and performance bond claims. (Stip. 5.)

6. Joel Spivey and Ronnie Spivey testified that they did not provide Sureties with any defenses to either the payment bond or performance bond claims. Instead, Joel Spivey maintained that he made repeated requests to meet with Sureties after Sureties took over the Lowndes Project in order to discuss Douglas Asphalt's continued participation on the Lowndes Project.

7. After investigating the merits of the performance bond claim and receiving no defenses from Douglas Asphalt, Sureties paid $15,424,798.42 to complete and/or remediate Douglas Asphalt's work on the Lowndes Project. (Stip. 5.)

8. Sureties have also incurred attorneys' fees, costs, and expenses associated with bringing this action. (Stip. 6.)

9. Sureties made a demand on Indemnitors to collateralize or otherwise indemnify Sureties for the disbursements made on the performance bond claim. (Stip. 8.)

10. Mr. Logue, Joel Spivey, and Ronnie Spivey testified that they did not ask Sureties to defend any claim and have not deposited any collateral security with Sureties.

**C. Sureties' Take Over of Lowndes Project**

**1. Timeliness of Take Over**

a. Jack Pociask, Sureties' senior claims counsel, first consulted with Brenda Orrison, a surety and construction law attorney, about the Lowndes Project in December 2006.

b. Ms. Orrison offered testimony about Sureties response to GDOT's declaration of default on the Lowndes Project. The Court finds her testimony highly credible. Ms. Orrison testified that Mr. Pociask contacted her on January 9, 2007, after receiving GDOT's January 4, 2007 letter declaring Douglas Asphalt in default on the Lowndes Project. Mr. Pociask asked Ms. Orrison to participate in Sureties' investigation.

c. Two days later, on January 11, 2007, Mr. Pociask and Ms. Orrison conducted a series of meetings about the Lowndes Project. The first meeting included Lin Heath, an engineer and independent consultant with Nicholson Professional Consulting, and David Walker, the project manager for W.G. Yates Construction.

d. Next, Mr. Pociask, Ms. Orrison, Mr. Heath, and Mr. Walker met with Mr. Logue, who was acting on behalf of Douglas Asphalt. Ms. Orrison testified that Mr. Logue said that Douglas Asphalt had several claims against GDOT. Mr. Logue said that GDOT had declared Douglas Asphalt in default

on three other GDOT projects and that Douglas Asphalt was completing the projects on behalf of the surety. Mr. Logue also said that several aspects of the project could not be done at that time. For instance, paving could not begin until the weather changed and the air temperature was routinely warmer. Mr. Logue stated that striping was not scheduled to restart until April 2007.

e. Ms. Orrison testified that she asked to meet with Douglas Asphalt's principals during her upcoming visit to Douglas Asphalt's corporate office in Douglas, Georgia.

f. Later on the day of January 11, 2007, Mr. Pociask, Ms.Orrison, Mr. Heath, and Mr. Walker met with several GDOT representatives at GDOT's offices. Initially, Sureties' maintained that the payment bond claims were being resolved, thereby curing the default. GDOT refused to withdraw the default because the project was incomplete almost one year after the contractually required completion date and significant liquidated damages continued to accrue on the Lowndes Project.

g. Ms. Orrison testified that during the meeting with GDOT representatives, Sureties requested, and GDOT agreed to, an extension of the 10-day response time provided in GDOT specifications for project takeover upon default.

h. On January 15, 2007, Mr. Heath and Mr. Walker visited

8

the project site to see the work Douglas Asphalt had accomplished and see what work remained.

i.   On January 16, 2007, Mr. Pociask and Ms. Orrison traveled to Douglas Asphalt's offices in Douglas, Georgia, to review records in an effort to determine the status of the project.  Ms. Orrison testified that Douglas Asphalt personnel only gave Sureties' representatives access to records contained in two previously prepared packages, one containing bid documents used to estimate the original document and submitted to the GDOT, and the other containing subcontracts for the project, many of which were unexecuted. Ms. Orrison testified that Nicholson personnel obtained "a very few" additional documents from the job trailer at the project site.

j.   Ms. Orrison testified that Douglas Asphalt only made Mr. Logue available to meet with them.  Joel Spivey testified that he was not aware that Ms. Orrison and Mr. Pociask wanted to meet with him until they arrived at the Douglas Asphalt office and, at that time, he was out of town.  Mr. Spivey stated that he did not contact Sureties when he returned because "we were dealing with several defaults, and we had a lot going on, litigation with DOT, and we were trying to — everyone can't work on the same

thing and Mr. Logue was the point man on [the Lowndes Project] . . ."

k.  On January 17, 2007, Mr. Pociask, Ms. Orrison, Mr. Heath and Mr. Walker conducted a conference call to discuss what they had learned and how to respond to GDOT.  Ms. Orrison testified that liquidated damages and other penalties were accruing at as much as $5,600 a day.  Mr. Heath and Mr. Walker reported that Douglas Asphalt had completed significantly less work on the project than what Mr. Logue had represented, and that much information was missing from the Douglas Asphalt field office.  At that time, Mr. Pociask and Ms. Orrison made a preliminary decision that Sureties' performance bond obligations were triggered.

l.  Ms. Orrison and Mr. Pociask testified that after the January 17, 2007 conference call, Mr. Pociask met with several of his superiors and, on January 19, 2007, Sureties advised GDOT that Sureties would take over the Lowndes Project.

m.  When Sureties decided to take over the project, Nicholson remained a consultant.  Yates' role changed from consultant to completion contractor pursuant to Sureties' completion program.

n.  Nicholson's role was to monitor the work that was being completed, monitor the cost of that work, identify additional claims to be pursued against the GDOT and continue documenting those claims previously asserted by Douglas Asphalt.

o.  Mr. Heath and Mr. Pociask testified about Sureties' completion program.  Under the completion program, Sureties hired one of three pre-qualified contractors under previously competitively negotiated agreements to complete the project.  Mr. Pociask testified that the advantage of this completion program is that the work is completed more quickly.

p.  Mr. Heath opined that the completion program was the best way to complete the Lowndes Project.  According to Mr. Heath, allowing various contractors to bid on the project anew would have taken longer to complete and potentially created significant unknown risk exposure.

q.  Mr. Heath testified that Yates' fee on the Lowndes Project was less than the rate Yates had previously negotiated with Sureties.  Yates agreed to a five percent fee on the Lowndes Project.  Yates' previously negotiated fee with Sureties was six percent.

r.  Ms. Orrison testified that Sureties began work on the

project immediately after Sureties took over the project. Nicholson and Yates continued the work started on January 15, 2007 of determining how much work had been completed, determining how much work remained to be completed, determining how much of Douglas Asphalt's work had to be fixed, and attempting to ratify previous subcontractor and supplier contracts.

s.   Mr. Heath and Mr. Walker agreed with Ms. Orrison that work on the Lowndes Project began immediately.  Yates and Nicholson employees remained at the job site in order to quantify the work that needed to be completed, including any remedial work.

t.   Contrary to the testimony of Heath, Walker and Orrison, Defendants' witnesses, Ronnie Spivey, Joel Spivey, Kyle Spivey, and Mr. Logue, maintain that the work was completed in a slow fashion.  They testified that when they drove by the site a few months after the default, it did not appear to them that much work had been done.

u.   Mr. Heath testified that he recommended that Yates wait to begin site work until Nicholson completed its investigation and established a plan in order to avoid further delay once site work began.

v.   Yates completed work on the Lowndes Project in mid-

September of 2007.

w.   Ms. Orrison testified that she was unaware of any surety responding quicker on a defaulted project than Sureties did in this case.

**2.   Consideration of Douglas Asphalt to Complete Project**

a.   Ms. Orrison and Mr. Pociask testified that they did not consider Douglas Asphalt to complete the Lowndes Project because, based on Douglas Asphalt's delay in completing the project prior to Sureties' takeover, it did not appear that Douglas Asphalt was financially capable of completing the project.  Ms. Orrison testified that another surety was financially assisting Douglas Asphalt on twenty other projects that were in various stages of completion and/or default.

b.   Ms. Orrison testified that GDOT told Sureties that if Douglas Asphalt remained on the project site, GDOT would consider Douglas Asphalt Sureties' agent and would hold Sureties responsible for the project.  When Sureties advised GDOT that Douglas Asphalt was not Sureties' agent, GDOT stated that it would remove Douglas Asphalt from the project.

c.   Mr. Heath stated that Douglas Asphalt's absence on the

13

Lowndes Project did not hurt completion of the project.  Mr.
Heath credibly testified that a critical contractor refused
to work with Douglas Asphalt.  Mr. Heath further testified
that he had no knowledge of any subcontractor refusing to
return to the project in the absence of Douglas Asphalt.

d.   Ms. Orrison and Mr. Pociask testified that Douglas
Asphalt did not ask Sureties to provide funding so that
Douglas Asphalt could complete the Lowndes Project.


**3.   Defenses and Claims Against GDOT**

a.   Ms. Orrison testified that Mr. Logue stated at the
January 11, 2007 meeting that Douglas Asphalt had several
claims against the GDOT, including claims for traffic and
erosion control, valued at $700,000 to $800,000,
construction work on ramp number 18, valued at approximately
$1.6 million, and a 152-day time extension.

b.   In early 2007, Ms. Orrison sent GDOT a letter
reserving rights as to the various claims and defenses,
including those identified by Mr. Logue, on behalf of
Sureties and Douglas Asphalt.

c.   Sureties made numerous requests in writing to Douglas
Asphalt for documentation and any defenses to GDOT's
performance bond claim.  Mr. Logue and Indemnitors failed to

14

respond to any of Sureties' requests.  Joel Spivey testified that he "did not see the letters [sent directly to him] until a couple days" before the trial.  Mr. Spivey stated that he was not reading all of his mail because "we were being flooded with correspondence from a lot of different directions.  I could not read it all.  I had Tom [Logue] assisting me."

d.   Ms. Orrison testified that it was not unusual on a defaulted project for costs to exceed expectations for a number of reasons.  One reason costs were higher than anticipated on the Lowndes Project was GDOT had paid Douglas Asphalt 98 percent of the contract amount on the project while the project was only 90 percent to 92 percent complete.  Additionally, Yates spent approximately $2 million repairing defective work, and paid subcontractors and suppliers premiums in damages to get them involved with the project again.


II.  **CONCLUSIONS OF LAW**[1]

   Sureties contend that Indemnitors breached the terms of the Agreement by failing to reimbursement Sureties for

---

[1]   To the extent that any of these conclusions of law constitute findings of fact, they are hereby adopted as both.

disbursements made pursuant to Sureties' performance bond obligations.  Indemnitors contend that Sureties failed to perform their performance bond obligations in good faith, thereby relieving Indemnitors of their indemnification obligations.  Specifically, Indemnitors allege that Sureties acted in bad faith by:  (1) failing to assert valid defenses to GDOT's performance bond claim and to pursue Douglas Asphalt's claims against GDOT; (2) failing to timely take over the project after default; and (3) failing to fund Douglas Asphalt's continued work and excluding Douglas Asphalt from the Lowndes Project.


**Breach of Indemnity Agreement**

1.   The indemnity agreement the parties voluntarily executed in connection with the performance bond is valid and enforceable.  (Stip. 9); see Anderson v. U.S. Fid. & Guar. Co., 267 Ga. App. 624, 627, 600 S.E.2d 712, 715 (2004) (citations omitted) ("[T]his Court consistently has upheld the validity and enforceability of indemnification agreements executed in connection with the issuance of surety bonds.").

2.   Indemnitors agreed to "exonerate, indemnify, and keep indemnified the Surety from and against any and all

liability for losses and/or expenses of whatsoever kind or nature . . . which the Surety may sustain and incur . . . [b]y reason of having executed or procured the execution of the [payment and performance] Bonds."  (Agreement ¶ 2.)

3.   GDOT declared Douglas Asphalt in default on the Lowndes Project and demanded that Sureties complete the work. (Stip. 4.)

4.   Sureties have incurred principal losses on the Lowndes Project performance bond totaling $15,242,798.42.  (Stip. 5.)

5.   Sureties demanded that Indemnitors collateralize or indemnify Sureties for the incurred losses, and Indemnitors have not done so.  (Stip. 8.)

6.   Sureties owe Indemnitors a duty to act in good faith in settling GDOT's performance bond claim.  The Court has considered the holding in <u>McLendon v. Hartford Accident & Indemnity Company</u>, 119 Ga. App. 459, 461, 167 S.E.2d 725 (1969), that a surety may owe a fiduciary's duty of good faith to its indemnitors.  As the court in <u>Transamerica Insurance Co. v. H.V.A.C. Contractors, Inc.,</u> the Court can locate no authority for imposing on the surety any duty to the indemnitor beyond what is provided in the indemnity agreement.  <u>See</u>, 857 F. Supp. 969, 975 n.11 (N.D. Ga. 1994).

In the instant case, Sureties are entitled to reimbursement only for those disbursements made in good faith. (Agreement ¶ 2.) Thus, Sureties' duty to Indemnitors is to act in good faith, but does not require that they act with the loyalty of a fiduciary as urged by Indemnitors.

7.   In determining whether a surety acted in good faith, "[w]here a decision is left to the discretion of a designated entity, the question is not whether it was in fact erroneous, but whether it was in bad faith, arbitrary or capricious so as to amount to an abuse of that discretion." Transamerica Ins. Co., 857 F. Supp. at 975 (quoting Reliance Ins. Co. v. Romine, 707 F. Supp. 550, 552 (S.D. Ga. 1989)).  The standard applied is not "whether the surety conducted a reasonable investigation or otherwise acted reasonably in handling a claim but whether the surety's conduct was manifested by a lack of improper motive."  Philip L. Bruner and Patrick J. O'Connor, Jr., Bruner & O'Connor Construction Law § 10:108 (2008); see also Transamerica Ins. Co., 857 F. Supp. at 974.


**A.   Sureties' Failure to Assert Valid Defenses and Pursue Douglas Asphalt's Claims**

1.   In the Agreement, Sureties "have the right to adjust,

settle or compromise any claim, demand, suit or judgment upon the Bonds[.]" (Agreement ¶ 13.)

2. In the event Indemnitors requested Sureties to litigate or defend against a claim, Indemnitors were required to "deposit with the Surety, at the time of such request, cash or collateral satisfactory to the Surety in kind and amount, to be used in paying any judgment or judgments rendered or that may be rendered[.]" (Id.)

3. An indemnitor's failure to request that the surety defend against a claim and failure to post security collateral, when required to do so under the terms of the indemnity agreement, defeats the defense of bad faith. See Nguyen v. Lumbermens Mut. Cas. Co., 261 Ga. App. 553, 555, 583 S.E.2d 220, 223 (2003); Employers Ins. of Wausau v. Able Green, Inc., 749 F. Supp. 1100, 1102-03 (S.D. Fla. 1990); Transamerica Ins. Co. v. Avenell, 66 F.3d 715, 721 (5th Cir. 1995).

4. The uncontroverted evidence establishes that Indemnitors did not ask Sureties to defend against GDOT's performance bond claim and did not post any security collateral with Sureties as required under the terms of the Agreement.

5. Sureties have no independent duty to investigate a

19

claim.  See Transamerica Ins. Co., 857 F. Supp. at 974

("Defendants do not, however, direct the Court to a legal or

contractual duty on the part of the plaintiff to conduct any

such investigation"); see also Great Am. Ins. Co. v. Conart,

Inc., 2006 WL 839197, *5 (M.D. Ga. Mar. 29, 2006).

6.    However, even if Sureties had a duty to investigate,

the evidence in the record shows that Sureties investigated

GDOT's performance bond claim.  Indeed, Indemnitors have

stipulated that Sureties paid the claims only after

investigating them with the assistance of an independent

consulting firm, and only after Douglas Asphalt provided no

defense to the claim.  (Stip. 5.)

7.    Under Georgia law, a surety is discharged by any act of

the obligee which injures or increases the surety's risk.

O.C.G.A. § 10-7-22 (formerly Code § 103-203);  Brunswick

Nursing & Convalescent Ctr., Inc. v. Great Am. Ins. Co., 308

F. Supp. 297, 299 (5th Cir. 1970).[2]  In Brunswick Nursing,

the obligee's agent and principal changed the terms of

payments to the contractor from that provided in the

contract in order for the agent to retain kickbacks totaling

---

[2]    In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en
banc), the Eleventh Circuit adopted all decisions by the Fifth Circuit
Court of Appeals issued prior to October 1, 1981, as binding precedent
on this Court.

$78,337.50. The trial court found that such a change in the payment terms operated to discharge the surety. Id. at 300. In the instant case, GDOT paid Douglas Asphalt 98 percent of the contract amount on the project at the time of default. Sureties' investigation determined that the project was only 90 percent to 92 percent complete. Defendants have presented no evidence showing that the overpayment resulted from a change by the obligee and principal in the terms of the payment schedule. GDOT's alleged overpayment to Douglas Asphalt did not relieve Sureties of their performance bond obligations.

8. Accordingly, Sureties did not act in bad faith by settling the performance bond claim without asserting valid defenses and pursuing Douglas Asphalt's claims.


**B.  Sureties Failure to Timely Take Over the Lowndes Project**

1. Under Georgia law, a surety may act in bad faith in failing to timely take over a bonded project upon notice of default. See O.C.G.A. § 10-7-30(b).

2. GDOT specification for take over upon default gave the surety ten days to respond to a declaration of default. At the January 11, 2007 meeting with GDOT representatives,

21

Ms. Orrison requested, and GDOT agreed to, a 10-day extension in order for Sureties to conduct an investigation. Therefore, Sureties were required to respond to GDOT's declaration of default within twenty days.

3.   The uncontroverted evidence establishes that Sureties timely notified GDOT of its intention to take over the Lowndes Project on or about January 19, 2007, within twenty days of GDOT's January 4, 2007 declaration of default.

4.   Likewise, the credible evidence establishes that Sureties investigated and completed work on the Lowndes Project in a timely manner.  Sureties assembled an investigatory team, and met with Douglas Asphalt and GDOT representatives, within two days of receipt of GDOT's letter declaring Douglas Asphalt in default.  Less than a week later, the investigatory team was at the job site to determine the status of the project.  At Mr. Heath's recommendation, Yates completed its investigation and established a plan before site work began on the Lowndes Project.  Yates completed work on the project in mid-September 2007.

5.   Indemnitors' testimony that they drove by the job site several months after GDOT declared Douglas Asphalt in default on the project and observed little work being

done does not overcome Sureties' credible evidence of the expedient manner in which Sureties handled the Lowndes Project.

6.   Accordingly, Sureties did not act in bad faith in taking over and completing work on the Lowndes Project.  The great weight of the evidence showed that Sureties acted in a timely manner in investigating and completing the project.


**C.   <u>Sureties Failure to Fund Douglas Asphalt's Continued Work and Exclusion of Douglas Asphalt from the Lowndes Project</u>**

1.   Indemnitors agreed that, "[i]n the event of any breach or default asserted by the obligee . . ., the Surety shall have the right, at its option and in its sole dis-cretion . . . to take possession of any part or all of the work under any contract . . . covered by any said Bonds, and at the expense of the Contractor and Indemnitors to complete or arrange for the completion of the same[.]" (Agreement ¶ 6.)

2.   Indemnitors offer, and the Court did not find, any authority to support Indemnitors' assertion that Sureties had any duty to fund, or otherwise permit Douglas Asphalt to participate in, the Lowndes Project after Sureties took over the project.

3.    Even if the Court concluded that Sureties had a duty to consider selecting Douglas Asphalt to complete the project, the credible evidence establishes that Douglas Asphalt did not have the capability to complete the Lowndes Project.

4.    Exercise of a contractual right, without more, cannot form the basis for a claim of bad faith.  See Marriott Corp. v. Dasta Constr. Co., 26 F.3d 1057, 1069-070 (11th Cir. 1994) ("[T]he exercise of a legitimate contractual right simply does not amount to a wrongful act.").  There is simply no evidence indicating that Sureties acted in bad faith by refusing to fund the project and refusing to allow Douglas Asphalt on the project.


**CONCLUSION**

Defendants devoted considerable trial time making two points — the existence of friction between Douglas Asphalt and GDOT and Ronnie Spivey's limited role at Douglas Asphalt at the time of the default.  Although Ronnie Spivey argued that he should be relieved from his contractual obligations because he had so little to do with Douglas Asphalt, there is no legal authority for obviating the agreement based on his lack of interest in Douglas Asphalt.  Likewise, the existence of friction between Douglas Asphalt and GDOT, the

subject of other pending litigation, does not relieve Indemnitors of their contractual obligation to indemnify Sureties.

Having made the foregoing findings of facts and conclusions of law, the Court finds that Plaintiffs are entitled to judgment in their favor and against Defendants, jointly and severally, in the amount of $15,424,798.42, plus pre-judgment interest, and  attorney's fees, costs, and expenses.

The Court requests the parties to stipulate to the pre-judgment interest, reasonable attorney's fees, cost and expense amounts, and the total amount of judgment.  Failing stipulation, the parties shall file with the Court supplemental pleadings within thirty (30) days of entry of this Order.

**SO ORDERED,** this 22nd  day of December, 2008.

_____
JUDGE, UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA